**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Akkad Holdings, LLC,

                Plaintiff,

v.                                 Case No. 1:20-cv-4476-MLB

Trapollo, LLC, et al.,

                Defendants.

_____/

## OPINION & ORDER

For the reasons set forth below, the Court grants Defendants Trapollo, LLC's and Michael Braham's motions to dismiss. (Dkts. 47; 48.)

## I.  Background

In May 2020, Plaintiff Akkad Holdings, LLC contacted Trapollo to purchase COVID-19 rapid tests and test kits. (Dkt. 42 ¶ 10.) Akkad inquired about the test quality and efficacy, pricing, governmental approvals, and general availability. (*Id.* ¶ 11.) Trapollo confirmed it could supply COVID-19 rapid tests and test kits to Akkad on the following terms:

- Trapollo could supply Akkad with 150,000 COVID-19 test kits, with each kit containing 25 COVID-19 rapid tests and identified affiliated and associated items;
- Pre-EUA approval, the sale price would be ███ per test kit;
- Post-EUA approval, the sale price would be ███ per test kit; and
- 150,000 test kits containing 3,750,000 COVID-19 rapid tests were immediately available at the facilities of the manufacturer

("COVID-19 Test Purchase Terms").[1]  (*Id.* ¶ 12.)  Trapollo and its Chief Executive Officer (Braham) repeatedly confirmed Trapollo could immediately supply the 3.75 million tests identified in the fourth bullet of the COVID-19 Test Purchase Terms.  (*Id.* ¶ 14.)  Akkad asked whether the manufacturer had Emergency Use Authorization ("EUA") from the Food and Drug Administration ("FDA").  (*Id.* ¶ 15.)  Trapollo and Braham said the manufacturer's application was pending.  (*Id.* ¶ 16.)  Based on these representations, Akkad signed a supply agreement on May 22, 2020 with Trapollo.  (*Id.* ¶¶ 21–22.)  The agreement included the COVID-19 Test Purchase Terms.  (*Id.* ¶ 24.)

Shortly after, Trapollo and Braham asked Akkad to pay more than $1 million as a deposit, saying Trapollo would begin complying with its

---

[1] "EUA" is the Emergency Use Authorization authority granted to the Food and Drug Administration ("FDA").

contractual obligations upon receipt of the money. (*Id.* ¶ 29.) Akkad did so. (*Id.* ¶ 30.) Akkad quickly learned the FDA had not granted the manufacturer EUA approval and instead had placed the tests on a "Do Not Distribute" list. (*Id.* ¶ 31.) When confronted, Trapollo (through Braham) initially denied that had happened. (*Id.* ¶ 32.) Eventually, however, they acknowledged the problem, provided some explanation for the difficulty, said the manufacturer was working with the FDA to obtain the authorization, and assured Akkad the problem would be fixed in a "matter of days." (*Id.* ¶¶ 33–34.)

The promised "matter of days" turned into weeks. (*Id.* ¶ 35.) Akkad eventually asked Trapollo and Braham to return its deposit and cancel the supply agreement. (*Id.*) Trapollo and Braham refused. (*Id.* ¶ 36.) They continued to assure Akkad that the problems would be fixed. (*Id.*) Making the most of a bad situation, Akkad found a third party in Mexico that wanted to purchase COVID-19 rapid tests and entered into a purchase order with that company to supply 20 million tests. (*Id.* ¶ 37.) Akkad then looked to Trapollo to supply the tests. Specifically, on July 1, 2021, Akkad asked Trapollo to provide the 3.75 million tests identified in the fourth bullet of the COVID-19 Test Purchase Terms. (*Id.* ¶ 38.)

Braham raised several problems with doing so.  He first said Trapollo had to check with the manufacturer about the availability of the test kits. (*Id.* ¶ 40.)  He also expressed concern about whether Trapollo could distribute tests on the FDA's "Do Not Distribute" list.  (*Id.* ¶ 42.)  He then claimed Trapollo had to secure executive approval from the manufacturer before releasing any tests but later said it actually had to get approval from an executive with the manufacturer's parent company in Shanghai, China.  (*Id.* ¶¶ 43–44.)  During all of this, he continued assuring Akkad the manufacturer had plenty of tests to satisfy Akkad's purchase order with the Mexican customer.  (*Id.* ¶ 45.)

Akkad quickly discovered Trapollo had not been honest. Specifically, it learned Trapollo never inquired with the manufacturer about the EUA approval status, the manufacturer never expected the FDA to take its tests off the "Do Not Distribute" list, the manufacturer had no "parent company" in Shanghai, the manufacturer only had approximately 1.2 million COVID-19 rapid tests available for sale, and the manufacturer never agreed to Trapollo's price.  (*Id.* ¶¶ 46–47.)  All of this—of course—meant Trapollo could not supply the tests as required by the COVID-19 Test Purchase Terms, specifically as required by the

fourth bullet which guaranteed immediate availability of 3.75 million tests.

Based on this alleged breach, Akkad again requested the return of its deposit and termination of the supply agreement. (*Id.* ¶ 49.) Trapollo again refused. (*Id.* ¶ 50.) Akkad demanded that Trapollo comply with its obligations under the supply agreement, at least in part, by supplying the 1.2 million tests the manufacturer had available on the terms specified in the supply agreement. (*Id.* ¶ 54.) Trapollo—perhaps not surprisingly given its track record—refused. (*Id.* ¶ 55.) On October 12, 2020, Akkad sent a letter to Trapollo stating, "Under the circumstances, it is the intent of Akkad Holdings to formally rescind the [supply a]greement, and we hereby formally advise Trapollo of that election." (*Id.* ¶ 68.)

Akkad sued Trapollo asserting eleven claims: breach of contract (Count I), money had and received (Count II), unjust enrichment (Count III), fraud in the inducement (Count IV), conversion (Count V), conspiracy (Count VI), negligent misrepresentation (Count VII), mutual mistake/rescission (Count VIII), unilateral mistake/rescission (Count IX), punitive damages (Count X), and attorneys' fees (Count XI). (*Id.*

¶¶ 69–112.)  Akkad also sued Braham, asserting five causes of action: fraud in the inducement (Count IV), conspiracy (Count VI), negligent misrepresentation (Count VII), punitive damages (Count X), and attorneys' fees (Count XI).  (*Id.* ¶¶ 81–86, 93–99, 108–12.)  Trapollo seeks dismissal of all the claims against it except Counts I and XI.  (Dkt. 47.) Braham seeks dismissal of all five claims asserted against him.  (Dkt. 48.)

## II.  Legal Standard

A court may dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)).  Even so, a complaint offering mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Put another way, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This so-called "plausibility standard" is not a probability requirement. *Id.* Even if a plaintiff will probably not recover, a complaint may still survive a motion to dismiss for failure to state a claim, and a court reviewing such a motion should bear in mind that it is testing the sufficiency of the complaint, not the merits of the case. *Twombly*, 550 U.S. at 556.

## III. Discussion[2]

### A. Rescission

Trapollo and Braham argue Akkad waived its right to rescind the agreement. (Dkts. 47-1 at 18–21; 48-1 at 15–19.) Akkad disagrees, arguing it timely invoked its right to rescind. (Dkts. 52 at 13–17; 53 at

---

[2] Significant portions of the briefs (both in support and in opposition) for Trapollo's motion are identical to those for Braham's motion. For brevity purposes, the Court addresses both motions at the same time when possible.

13–17.)  A party must promptly notify the other party of its intent to rescind "as soon as the facts supporting the claim for rescission are discovered." *Weinstock v. Novare Grp., Inc.*, 710 S.E.2d 150, 154 (Ga. Ct. App. 2011); *Pearson v. George*, 77 S.E.2d 1, 6 (Ga. 1953) ("If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it; otherwise he cannot avoid or rescind such contract.").  "[T]he intent to rescind must be unequivocal." *Bivin-Hunter v. Wyndham Vacation Resorts, Inc.*, 2010 WL 11601332, at *5 n.16 (N.D. Ga. Sept. 1, 2010) (an aggrieved party must adhere to its intent to rescind).  If a party "takes *any* action inconsistent with repudiation of the transaction, [it] cannot rescind the contract."[3] *Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 248 F.R.D. 298, 309 (N.D. Ga. 2008) (emphasis added), *aff'd*, 555 F.3d

---

[3] For example, in *Aliabadi v. McCar Development Corp.*, 547 S.E.2d 607 (Ga. Ct. App. 2001), the plaintiffs bought a home but after closing discovered that the home encroached upon a county easement for an underground water line.  *Id.* at 608.  They sought to rescind the contract because of a mistake of fact, urging that they did not receive what they bargained for (e.g., a home that was free and clear of all encumbrances). *Id.* at 611.  The court found rescission was foreclosed because the plaintiffs made improvements to the home after their demand for rescission.  *Id.*  Those actions, according to the court, were inconsistent with an intention to repudiate the contract.  *Id.*

1331 (11th Cir. 2009). "Once a claim for rescission is waived, it cannot be revived." *Holloman v. D.R. Horton, Inc.*, 524 S.E.2d 790, 795 (Ga. Ct. App. 1999). "While normally the question of waiver is a matter for the jury, where, as here, the facts and circumstances essential to the waiver issue are clearly established, waiver becomes a question of law." *Partner Servs., Inc. v. Avanade, Inc.*, 2013 WL 12180442, at *4 (N.D. Ga. Aug. 26, 2013).

The facts as alleged by Akkad establish that it took actions inconsistent with rescinding the contract after learning of its right to do so. Akkad alleges that, relying on the false COVID-19 Test Purchase Terms represented by Trapollo and Braham, Akkad agreed to purchase tests and test kits from Trapollo. (Dkt. 42 ¶ 21.) Akkad and Trapollo entered into a supply agreement, which included the COVID-19 Test Purchase Terms. (*Id.* ¶¶ 22, 24.) As already explained, one of those terms provided that 3.75 million tests were immediately available at the facilities of the manufacturer. (*Id.* ¶ 12(iv).) Sometime after paying the deposit, Akkad learned that Trapollo's and Braham's representation that the tests were "immediately available" was false, specifically because the manufacturer had only approximately 1.2 million tests available. (*Id.* ¶¶

46, 47(e).) At that point, Akkad knew Defendants had falsely represented their ability to deliver all 3.75 million tests. Whether classified as a mistake or fraud, Akkad knew all the facts necessary to assert its right to rescind. But Akkad did not immediately do so. Instead, Akkad "requested that Trapollo comply with its obligations under the [s]upply [a]greement, *at least in part*" by securing the 1.2 million tests the manufacturer had available." (*Id.* ¶ 54 (emphasis added).)

The facts as alleged by Akkad establish that Akkad was on notice of the facts giving rise to rescission (that Trapollo could not immediately deliver 3.75 million tests) but took actions consistent with affirming the agreement (demanding that Trapollo provide a smaller number of tests). Under Georgia law, this conduct waives the right to rescission. In *Orion Capital Partners, LP v. Westinghouse Electric Corp.*, 478 S.E.2d 382 (Ga. Ct. App. 1996), for example, the buyer of a pet food business discovered the pet food was mislabeled and the business was operating illegally, all contrary to the seller's representations. *Id.* at 383–84. Instead of rescinding promptly after discovering this fraud, the buyer continued to operate the business and spent months trying to fix the problems. *Id.* at 385. The court found the buyer's actions were "totally incompatible with

contract rescission." *Id.* The same rule applies here. By taking actions consistent with affirming the agreement and inconsistent with rescission, Akkad forfeited its right to rescind the contract. *See Buckley v. Turner Heritage Homes, Inc.*, 547 S.E.2d 373, 375 (Ga. Ct. App. 2001) ("[T]he aggrieved party must adhere to the intent to rescind and may waive any claim for rescission by failing to do so.").

Trapollo and Braham raise yet another argument against rescission. They say that, by asserting a breach of contract claim in its initial complaint, Akkad lost its right to rescind. (Dkts. 47-1 at 16–18; 48-1 at 14–15.) They rely on *Liberty v. Storage Trust Properties, LP*, 600 S.E.2d 841 (Ga. Ct. App. 2004), for the proposition that when a plaintiff seeks damages for breach of contract in a complaint, the plaintiff is deemed to have taken action inconsistent with repudiation of the contract and thus loses any right to rescind the contract. (Dkts. 47-1 at 17; 48-1 at 15.) Akkad argues that (1) this argument is without merit because it is well-established in Georgia and this Circuit that a plaintiff may plead alternative, inconsistent remedies and pursue all such remedies until a verdict is rendered and (2) Trapollo and Braham mischaracterize *Liberty*. (Dkts. 52 at 10–11; 53 at 10–11.) Akkad is correct that the general rule

in Georgia and this Circuit is that a plaintiff may pursue inconsistent remedies until a verdict is reached. *See Vivid Invs., Inc. v. Best W. Inn-Forsyth, Ltd.*, 991 F.2d 690, 691–92 (11th Cir. 1993) (per curiam). Trapollo and Braham concede this point. (Dkts. 55 at 11; 56 at 5.) But that is a rule of pleading. And Georgia substantive law says that a plaintiff can waive the right to rescind based on its pleadings, specifically if a plaintiff asserts rescission for the first time in a pleading that also asserts a breach of contract claim.

In *Liberty*, the plaintiff filed suit for breach of contract and fraud. 600 S.E.2d at 844. Although the plaintiff asserted that "the [a]greement is hereby rescinded" in the fraud count of his complaint, he did not assert a separate cause of action for rescission or seek rescission in his prayer for relief. *Id.* The court reasoned that, because the plaintiff sought to rescind the agreement for the first time in his complaint, the plaintiff's simultaneous assertion of a breach of contract claim constituted action "inconsistent with a repudiation of the transaction," thus waiving any right to rescission. *Id.* at 846–47; *see also Holloman,* 524 S.E.2d at 795–96 (finding waiver of right to rescind when original complaint affirmed the contract and did not include a count seeking rescission).

12

Trapollo and Braham argue that Akkad failed to elect rescission properly in its initial complaint thus making rescission in the amended complaint untimely.  (Dkts. 55 at 13; 56 at 5.)  Akkad's original complaint, filed on November 2, 2020, contained counts for "Mutual Mistake/Rescission" and "Unilateral Mistake/Rescission."  (Dkt. 1 at 30–31.)  Under the former, Akkad alleged it "shows it is entitled to rescind the subject [agreement] and hereby elects to do so."  (*Id.* at 30.)  Under the latter, Akkad alleged that it "is entitled to rescind the [agreement] and hereby elects to do so."  (*Id.* at 31.)  Trapollo and Braham argue that these allegations (most importantly, the use of the words "hereby elects") evidence Akkad electing rescission for the ***first time*** in its complaint, which, according to them, "is clearly improper under Georgia law." (Dkts. 55 at 13; 56 at 5.)   Akkad disagrees, saying it provided notice of its election to rescind "weeks before filing suit."  (Dkts. 52 at 13; 53 at 13.) The Court assumes Akkad is talking about its October 12, 2020 letter. But, as Trapollo and Braham note (Dkts. 55 at 14; 56 at 5), Akkad's original complaint made no mention of that letter.  More than three months after filing suit, Akkad amended its complaint to include allegations about the October 12, 2020 letter.  (Dkt. 42 ¶ 68.)  While that

13

letter purports to be Akkad's formal election of rescission, it simultaneously threatens litigation for, among other things, breach of contract, thereby undermining any intent to rescind. (Dkt. 42-2 at 3–4.) Nevertheless, given the Federal Rules of Civil Procedure's liberal pleading standards and reading Akkad's initial complaint and the October 12, 2020 letter in the light most favorable to Akkad, the Court concludes Akkad's reference to rescission in its original complaint was a reference to the earlier letter. The Court thus concludes *Liberty* is inapplicable.

For the reasons set forth above, the Court finds Akkad waived its right to rescind based on Akkad's admitted conduct after it learned Trapollo could not procure all 3.75 million tests and decided to continue demanding compliance with the agreement thereafter.

## B.   Counts IV and VII: Fraud in the Inducement and Negligent Misrepresentation

Akkad alleges Trapollo and Braham either negligently or fraudulently misrepresented Trapollo's intent and ability to deliver the test kits under the agreement. (Dkts. 42 ¶¶ 18, 82–83, 97; 52 at 7; 53 at 7.) It says Trapollo and Braham made the misrepresentations in the COVID-19 Test Purchase Terms to induce Akkad to make a deposit of

more than $1 million to Trapollo.  (Dkt. 42 ¶ 19.)  Trapollo and Braham argue that Akkad's claims for fraud in the inducement and negligent misrepresentation fail for several reasons. The Court rejects all but one.

### 1.   Contradiction

First, Trapollo and Braham argue that Akkad cannot rescind the agreement on the basis of an alleged misrepresentation that the agreement directly contradicts.  (Dkts. 47-1 at 11; 48-1 at 9.)  They point to Akkad's general allegation that soon after making the deposit, it discovered EUA approval had not been received and instead, the test kits were placed on the FDA's "Do Not Distribute" list.  (Dkts. 47-1 at 13; 48-1 at 11; *see also* Dkt. 42 ¶ 46.)  Trapollo and Braham contend the agreement expressly contemplates the test kits were pending FDA approval at the time of the contract because the agreement shows the cost of the kits would vary pre- and post-FDA approval.  (Dkts. 47-1 at 13; 48-1 at 11.)  According to them, the express terms of the agreement thus contradict Akkad's allegations that Trapollo, pre-contract, misrepresented the status of the regulatory approval for the test kits.  (Dkts. 47-1 at 13; 48-1 at 11.)   Akkad says this contention reveals a fundamental

misunderstanding of the agreement and the allegations in the complaint. (Dkts. 52 at 7–8; 53 at 7–8.)  The Court agrees.

The agreement contemplates that the test kits were awaiting EUA approval because it has a pre-EUA price and a post-EUA price under which Trapollo agreed to sell the test kits to Akkad.  Trapollo had an obligation to sell the test kits to Akkad with or without EUA approval. But, more importantly, Trapollo and Braham seem to misunderstand Akkad's fraud in the inducement and negligent misrepresentation claims.  The EUA allegations have nothing to do with those claims.  The COVID-19 Test Purchase Terms are the only misrepresentations Akkad asserts in its fraud in the inducement and negligent misrepresentation claims.  The Court thus rejects Trapollo's and Braham's argument that Akkad cannot state a claim for fraud in the inducement or negligent misrepresentation because the agreement contemplates that the test kits were pending EUA approval.

### 2.   Merger Clause

Trapollo's and Braham's second argument deals with the agreement's merger clause, which states:

> This Agreement together with the Product Invoice represents the entire integrated contract of the parties with respect to

the terms of purchase and sale of the Products, and supersedes all previous agreements and understandings between the parties with respect to the subject matter of this Agreement, and may not be modified except by an instrument in writing signed by the duly authorized representatives of the parties.

(Dkt. 42-1 at 4.)   In contracts with a merger clause, "prior or contemporaneous representations that contradict the written contract 'cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.'" *First Data POS, Inc. v. Willis*, 546 S.E.2d 781, 784 (Ga. 2001) (quoting *Campbell v. C & S Nat'l Bank*, 415 S.E.2d 193 (Ga. Ct. App. 1992)).   So when a contract contains a merger clause, "that clause operates as a disclaimer, establishing that the written contract completely and comprehensively represents all of the parties' agreement" and thus "bars [the plaintiff] from asserting reliance on the alleged misrepresentation not contained within the contract." *Pennington v. Braxley*, 480 S.E.2d 357, 359 (Ga. Ct. App. 1997).

Trapollo and Braham contend the merger clause bars Akkad's claims for fraud in the inducement and negligent misrepresentation

because Akkad affirmed the agreement.[4]  (Dkts. 47-1 at 21; 48-1 at 20.)

Indeed, "[w]here a purchaser affirms a contract that contains a merger

or disclaimer provision, he is estopped from asserting reliance on a

representation that is not part of the contract." *Novare Grp., Inc. v. Sarif*,

718 S.E.2d 304, 309 (Ga. 2011).  But Trapollo and Braham ignore the

significance of the last part of that quote.  A merger clause "prevents a

party from claiming reliance upon a representation *not contained in the*

*contract*, [but i]t does not prevent a claim of fraud arising from

representations in the contract itself." *Conway v. Romarion*, 557 S.E.2d

54, 58 (Ga. Ct. App. 2001); *see also Woodhull Corp. v. Saibaba Corp.*, 507

---

[4] Akkad says Trapollo's and Braham's argument fails because Akkad
properly rescinded the agreement. (Dkts. 52 at 17–18; 53 at 17–18.)  As
discussed above, Akkad waived its right to rescind the agreement by
taking actions consistent with affirming the agreement.  *See supra*
Section III.A.  Akkad also argues that, even if the merger clause applies,
the terms of the agreement are not enforceable to bar Akkad's claims for
intentional or grossly negligent tortious conduct.  (Dkts. 52 at 18; 53 at
18.)  As support, Akkad quotes case law that says "[i]n Georgia
exculpatory or limitation-of-liability clauses can be valid and binding and
are not void as against public policy unless they purport to relieve
liability for acts of gross negligence or willful or wonton conduct." (Dkts.
52 at 18; 53 at 18.)  A merger clause is not an exculpatory or limitation-
of-liability clause.  *See Pennington*, 480 S.E.2d at 360–61 (rejecting a
claim that a contractual merger clause was akin to an exculpatory clause
and should be found to violate public policy because of "key differences"
between the two provisions).

S.E.2d 493, 497 (Ga. Ct. App. 1998) ("Generally, false representations that induce the party to enter into the contract are merged through the contract merger language, but [when] the same misrepresentations were made as part of the contract, there [is] no merger."); *Reichman v. S. Ear, Nose & Throat Surgeons, PC*, 598 S.E.2d 12, 16 (Ga. Ct. App. 2004) ("If the contract has a merger clause and the party has affirmed the contract, the merger clause generally precludes any fraud action for oral misrepresentations not included in the agreement.  In circumstances where the misrepresentation actually becomes a term of the contract, however, a party electing to affirm the contract may sue in tort for fraud . . . ." (internal citation omitted)).   Here, the alleged misrepresentations are the COVID-19 Test Purchase Terms, which were incorporated into the supply agreement.  Accordingly, these claims are *not* barred by the merger clause.  *See Conway*, 557 S.E.2d at 58 ("[T]o the extent that the Conways assert that the disclosure statement, which was incorporated into the parties' agreement, or some other representation in the contract itself is fraudulent, such a claim would not be barred by the merger clause.").  The Court rejects Trapollo's and Braham's argument

that the merger clause bars Akkad's claims for fraud in the inducement and negligent misrepresentation.

### 3. Particularity

Trapollo and Braham next argue Akkad's allegations fail to satisfy the particularity requirements set forth in Federal Rule of Civil Procedure 9(b).  (Dkts. 47-1 at 23; 48-1 at 21.)  Under Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This rule also applies to Akkad's negligent misrepresentation claim.[5]  Rule 9(b) may be satisfied if the

---

[5] The cases in this Court are inconsistent on whether the heightened pleading standards of Rule 9(b) apply to claims of negligent misrepresentation.  *Compare Singleton v. Petland Mall of Ga. LLC*, 2020 WL 3400194, at *3 (N.D. Ga. Mar. 18, 2020) (Rule 9(b) does apply); *250 Park Ave. W. 904, LLC v. Centennial Park W. Condo. Ass'n, Inc.*, 2016 WL 11733853, at *4 (N.D. Ga. Aug. 5, 2016) (same), *with Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1339 (N.D. Ga. 2021) (Rule 9(b) does not apply); *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 371 F. Supp. 3d 1150, 1177 (N.D. Ga. 2019) (same); *Higgins v. Bank of Am., NA*, 2015 WL 12086083, at *4 (N.D. Ga. Sept. 22, 2015) (same), *adopted by* 2015 WL 12086093 (N.D. Ga. Oct. 20, 2015).  The Eleventh Circuit has held that Rule 9(b) applies to negligent misrepresentation claims under Florida law because such claims sound in fraud.  *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019).  But negligent misrepresentation in Georgia "sounds in tort, and more specifically, in the law of negligence."  *Baker v. GOSI Enters., Ltd.*, 830 S.E.2d 765, 769 (Ga. Ct. App. 2019).  Based off *Wilding* and *Baker*, one could reason that Rule 9(b) does not apply to a negligent misrepresentation claim brought

complaint sets forth (1) precisely what statements were made (or omitted) and how that was done, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. *Brooks*, 116 F.3d at 1371. Alternative means, however, are also available to satisfy the rule. *Id.* In cases involving multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Id.* at 1381. Essentially, Rule 9(b) requires the plaintiff to allege the "who,

---

under Georgia law. *See, e.g.*, *Shea*, 2021 WL 3087661, at *10 n.12. But Georgia law says fraud (which clearly falls within the purview of Rule 9(b)) and negligent misrepresentation are *very* similar: "[T]he only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed," so courts generally apply the "same principles . . . to both fraud and negligent misrepresentation cases." *Holmes v. Grubman*, 691 S.E.2d 196, 200 (Ga. 2010). Additionally, the Eleventh Circuit has implied Rule 9(b) applies to negligent misrepresentation claims under Georgia law. *See Smith v. Ocwen Fin.*, 488 F. App'x 426, 428 (11th Cir. 2012) (per curiam) (affirming this Court's dismissal of a Georgia negligent misrepresentation claim because the plaintiff failed to plead with particularity). Based off *Smith*, the Court concludes that Rule 9(b)'s heightened pleading requirements apply to negligent misrepresentation claims brought under Georgia law.

what, when, where, and how." *Manheim Remarketing, Inc. v. Carolina Auto Exps., Inc.*, 2017 WL 7615576, at *6 (N.D. Ga. Sept. 6, 2017).

The Court finds Akkad pled with sufficient particularly to satisfy Rule 9(b).  In May 2020, Akkad made an inquiry to Trapollo regarding the purchase of tests and test kits.  (Dkt. 42 ¶ 10.)  That same month, Trapollo and Braham repeatedly confirmed that it could immediately supply tests and test kits to Akkad pursuant to the COVID-19 Test Purchase Terms.  (*Id.* ¶¶ 12, 14.)  Relying on that, Akkad agreed to purchase tests and test kits from Trapollo.  (*Id.* ¶ 21.)  The COVID-19 Test Purchase Terms were incorporated into the supply agreement that Akkad and Trapollo signed on May 24, 2020.  (*Id.* ¶¶ 22, 24.)  For the fraud in the inducement claim, Akkad alleges that Trapollo and Braham misrepresented Trapollo's present intent and ability to deliver the test as required under the COVID-19 Test Purchase Terms.  (*Id.* ¶ 82.) Similarly, for the negligent misrepresentation claim, Akkad alleges that Trapollo and Braham negligently misrepresented Trapollo's present ability to procure and deliver the number of test kits required by the COVID-19 Test Purchase Terms.  (*Id.* ¶ 97.)  Akkad claims the Defendants made these false representations in the COVID-19 Test

Purchase Terms to induce Akkad to make a deposit of more than $1 million to Trapollo. (*Id.* ¶ 19.) This is sufficient, particularly in the light of the Eleventh Circuit's warning that the application of Rule 9(b) must not abrogate the concept of notice pleading. *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988).

### 4.    Absence of Special Relationship

Finally, Trapollo and Braham argue the agreement's purchase terms cannot form the basis of a tort claim absent a special relationship between the parties or other independent, legal duty. (Dkts. 47-1 at 14; 48-1 at 11.) In *Infinity Transportation III LLC v. XPO Intermodal, Inc.*, 304 F. Supp. 3d 1320 (N.D. Ga. 2018), the court found the plaintiff's negligent misrepresentation claim should be dismissed as an "improper attempt[] to repackage its breach of contract claim into various torts." *Id.* at 1331. The court reiterated the "general rule in Georgia is that a breach of contract cannot constitute a tort unless a special or confidential relationship exists between the parties" and concluded that "the defendant may not convert its breach of contract claim against the plaintiff into a tort for alleged negligent misrepresentation." *Id.* (citing *Cives Corp. v. Se. Invs., LLC (LA)*, 2014 WL 11822760, at *5 (N.D. Ga.

23

Apr. 14, 2014); *Kin Chun Chung v. JPMorgan Chase Bank, NA*, 975 F. Supp. 2d 1333, 1344–45 (N.D. Ga. 2013)).

Akkad did not address this argument in its response briefs.  (*See* Dkts. 52; 53.)  This is particularly troublesome, as "it is well settled that the party asserting the existence of a confidential relationship has the burden of establishing its existence."  *Willis v. Allstate Ins. Co.*, 740 S.E.2d 413, 417 (Ga. Ct. App. 2013) (internal quotation marks omitted) (citing *Canales v. Wilson Southland Ins. Agency*, 583 S.E.2d 203, 205 (Ga. Ct. App. 2003)).  Akkad did not allege in the amended complaint that either Trapollo or Braham had any duties that arose outside of the agreement[6] or that it had a special or confidential relationship with Trapollo or Braham that would give rise to a duty beyond the obligations outlined in the agreement.  (*See* Dkt. 42.)  Since Akkad's fraud in the inducement and negligent misrepresentation claims against Trapollo

---

[6] Akkad alleges that Trapollo and Braham failed to disclose "material facts" about the use of Akkad's deposit. (Dkt. 42 ¶¶ 84, 98.) To the extent this allegation can be construed as an attempt by Akkad to allege Trapollo and Braham had an independent duty to disclose, Georgia law says otherwise.  *See Am. Demolition Inc. v. Hapeville Hotel Ltd. P'ship*, 413 S.E.2d 749, 752 (Ga. Ct. App. 1991) (no independent duty to disclose when a transaction is an arm's length transaction between two professionals and there is no evidence of any special or confidential relationship).

and Braham relate only to duties imposed under the agreement, they cannot be re-packaged as independent torts. *See Courtesy Props., LLC v. S&ME, Inc.*, 2020 WL 7698659, at *6 (N.D. Ga. Dec. 28, 2020); *Miracle Mile Trucking & Logistics LLC v. Progressive Mountain Ins. Co.*, 2019 WL 4415964, at *5 (N.D. Ga. Sept. 16, 2019). For this reason, the Court dismisses Counts IV (fraud in the inducement) and VII (negligent misrepresentation) against Trapollo and Braham.

### C. Counts VIII and IX: Mutual Mistake/Rescission and Unilateral Mistake/Rescission

Akkad asserts claims for mutual mistake and unilateral mistake, seeking recission for both. As discussed above, Akkad has waived any right to rescind the agreement. *See supra* Section III.A. So these claims fail as a matter of law for that reason. Trapollo also argues Akkad's mistake claims fail to satisfy the particularity requirements set forth in Rule 9(b). (Dkt. 47-1 at 23.) As also already explained, that rule essentially requires a plaintiff pleading fraud to identify the who, what, when, where, and how of his or her fraud allegations. *Brooks*, 116 F.3d at 1371. The same pleading standard applies to allegations of mistake. *See Barber v. Am.'s Wholesale Lender*, 542 F. App'x 832, 838 (11th Cir. 2013) (per curiam).

Having reviewed Akkad's mistake allegations (*see* Dkt. 42 ¶¶ 101, 105), the Court concludes Akkad does not allege with particularity the circumstances constituting the alleged mistake.  Indeed, Akkad "do[es] not precisely point to the time, place, or person who made the statements or omissions that led to the[] mistake." *Barber*, 542 F. App'x at 838.  The Court dismisses Counts VIII (mutual mistake/rescission) and IX (unilateral mistake/rescission) against Trapollo.  *See, e.g.*, *S. Coal Corp. v. Drummond Coal Sales, Inc.*, 2017 WL 7550765, at *11 (N.D. Ga. Nov. 15, 2017) (mutual mistake not pled with sufficient particularity because allegations do not specify the content of any statements made regarding a mistake belief, who made the statements, and whether the statements were oral or written).  The Court does not provide an opportunity to amend these pleadings because Akkad has not properly made such a request and because revised mistake allegations would not cure the fact that Akkad did not act as necessary to rescind the contract.

### D.   Counts II and III: Money Had and Received and Unjust Enrichment

Akkad asserts Counts II and II against Trapollo.  (Dkts. 42 ¶¶ 74–80; 47-1 at 24–25.)  Trapollo argues that these claims fail when, as here, a legal contract governs.  (Dkt. 47-1 at 24.)  Indeed, "money had and

received is an equitable theory of recovery that applies only when there is no legal contract between the parties." *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009); *McGonigal v. McGonigal*, 669 S.E.2d 446, 447 (Ga. Ct. App. 2008).  Similarly, "unjust enrichment is only available in the absence of an enforceable contract." *Goldstein*, 609 F. Supp. 2d at 1347; *Cochran v. Ogletree*, 536 S.E.2d 194, 196 (Ga. Ct. App. 2000).  Akkad incorporated into both these claims the allegation that it and Trapollo entered into an agreement.  (Dkt. 42 ¶¶ 74–75, 78–79.)  As a result, these claims cannot withstand the motion to dismiss.  *See Goldstein*, 609 F. Supp. 2d at 1347 (holding that the equitable claims of unjust enrichment and money had and received were subject to dismissal because the plaintiff had incorporated into both equitable claims the allegation that he and the defendant had entered into a contract); *Am. Casual Dining, LP v. Moe's Sw. Grill, LLC*, 426 F. Supp. 2d 1356, 1371 (N.D. Ga. 2006) (holding that the plaintiff could not claim within a single count that there was an agreement and that the defendant was unjustly enriched).  Akkad contends Trapollo's argument fails because Akkad rescinded the agreement.  (Dkt. 53 at 19.)  As discussed above, Akkad waived any right to rescind the agreement.  *See*

*supra* Section III.A.  The Court dismisses Counts II (money had and received) and III (unjust enrichment) against Trapollo.

## E.    Count V: Conversion

Trapollo argues Akkad's conversion claim in Count V should be dismissed because Georgia law provides that to establish a claim for conversion apart from a contract claim, a plaintiff would need to show that it had a right to the money, other than under the contract, and Akkad does not allege any right separate from those in the agreement. (Dkt. 47-1 at 22.)  In its complaint, Akkad alleges that it paid a deposit to Trapollo for the purpose of fulfilling the terms of the agreement, but Trapollo failed to use the deposit as promised or immediately honor Akkad's request to return it.  (Dkt. 42 ¶¶ 88–90.)  Under Georgia law, a "tort claim for conversion cannot be based on the breach of a contractual duty alone."  *See ULQ, LLC v. Meder*, 666 S.E.2d 713, 719 (Ga. Ct. App. 2008); *see also Saks Mgmt. & Assocs., LLC v. Sung Gen. Contracting, Inc.*, 849 S.E.2d 19, 28–29 (Ga. Ct. App. 2020) ("[T]o establish a claim for conversion apart from [a] contract claim, [the plaintiff] would have to show that it had a right to the money, other than under the contract."). Because Akkad's claim arises from Trapollo's alleged failure to use the

28

deposit as promised under the agreement, this claim fails as a matter of law.  *See Unalisys Holdings, LLC v. Systel Bus. Equip. Co.*, 2011 WL 13174223, at *10 (N.D. Ga. Mar. 7, 2011).  Akkad contends Trapollo's argument fails because Akkad rescinded the agreement.  (Dkt. 53 at 19.)  As discussed above, Akkad waived any right to rescind the agreement.  *See supra* Section III.A.  The Court thus dismisses Count V (conversion) against Trapollo.

### F.    Count VI: Conspiracy

Trapollo and Braham argue Akkad's conspiracy claim in Count VI should be dismissed because Akkad has failed to state valid claims upon which its "conspiracy" allegations depend.  (Dkts. 47-1 at 25; 48-1 at 23–24.)  Akkad alleges Defendants conspired against Akkad "[t]hrough the actions complained of in Counts IV and V," which are fraud in the inducement and conversion, respectively.  (Dkt. 42 ¶ 94.)  Trapollo and Braham argue that because those claims fail, Akkad's conspiracy theory premised on those claims must also fail.  (Dkts. 47-1 at 25; 48-1 at 24.)  The Court agrees.

In Georgia, conspiracy is not an independent cause of action.  *See Oconee Fed. Sav. & Loan Ass'n v. Brown*, 831 S.E.2d 222, 232 (Ga. Ct.

App. 2019) ("The conspiracy itself furnishes no cause of action."). Instead, "[t]he cause of action for civil conspiracy lies not in the conspiracy itself, but in the underlying tort committed against the plaintiff and the resulting damage." *See Dyer v. Honea*, 557 S.E.2d 20, 25 (Ga. Ct. App. 2001) (affirming grant of summary judgment on conspiracy claim because underlying fraud claim failed). For Trapollo, both underlying claims are dismissed. Akkad did not bring a conversion claim against Braham (*See* Dkt. 42 at 25), but its fraudulent inducement claim against Braham is dismissed. Because no underlying actionable conduct remains, Akkad's conspiracy claim must fail. *Ass'n Servs., Inc. v. Smith*, 549 S.E.2d 454, 460 (Ga. Ct. App. 2001) ("It is well settled that a plaintiff cannot maintain an action for a conspiracy in the absence of underlying actionable conduct."). The Court dismisses Count VI (conspiracy) against both Trapollo and Braham.

### G.   Count X: Punitive Damages

Akkad seeks punitive damages against both defendants. Trapollo argues it should be dismissed because Akkad's only remaining substantive claim against it—breach of contract in Count I—cannot serve as a basis for punitive damages. (Dkt. 47-1 at 26.) The Court agrees.

*Blockum v. Fieldale Farms Corp.*, 610 S.E.2d 82, 84 (Ga. Ct. App. 2005) (punitive damages are not recoverable for breach of contract claims). Braham argues this claim should be dismissed because Akkad has failed to state valid claims upon which it depends. (Dkt. 48-1 at 24.) The Court agrees. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1304 (11th Cir. 2009) ("A punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required."). The Court dismisses Count X (punitive damages) against both Trapollo and Braham.

## H.    Count XI: Attorneys' Fees

Akkad brings this claim under O.C.G.A. § 13-6-11 against all Defendants, but only Braham seeks dismissal of it. (Dkts. 42 ¶¶ 111–13; 48-1 at 24–25.) Braham argues it should be dismissed because Akkad has failed to state valid claims upon which it depends. (Dkt. 48-1 at 24.) The Court agrees. *See McCalla Raymer, LLC v. Foxfire Acres, Inc.*, 846 S.E.2d 404, 413 (Ga. Ct. App. 2020) (an attorneys' fee claim is "derivative" so it cannot survive without an underlying claim). The Court dismisses Count XI (attorneys' fees) against Braham.

## IV.   Conclusion

The Court **GRANTS** Trapollo's motion to dismiss (Dkt. 47) and Braham's motion to dismiss (Dkt. 48).   Only Count I (breach of contract) and Count XI (attorneys' fees) remain against Trapollo.   No claims remain against Braham, so Braham is dismissed entirely.

This Order does not affect Cumberland Bulloch, LLC, who is the other defendant in this case.   The Court is aware Akkad recently filed a motion for entry of default judgment against Cumberland (Dkt. 61).   The Court will address that motion in a later order.

**SO ORDERED** this 16th day of December, 2021.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE